UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                        Case Number 24-20151

v.                                        Honorable David M. Lawson

MAHDI HOWARD,

        Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

On an evening in February 2024, Detroit Police officers on routine patrol came across a car parked on a neighborhood street facing against traffic and blocking the sidewalk. Defendant Mahdi Howard was behind the wheel. The investigation led to Howard's removal from the car, and the ensuing search of the front passenger compartment turned up a firearm, which Howard could not legally possess because of his felony record. He was charged with illegally possessing the gun as a convicted felon, and he filed a motion to suppress the evidence alleging an unlawful search. The Court held an evidentiary hearing on November 26, 2024. Because the police officers did not conduct an unreasonable search of the car or an unreasonable seizure of the firearm, there was no Fourth Amendment violation and no basis to suppress the evidence. The motion will be denied.

I.

The facts adduced at the evidentiary hearing are straightforward, and much of the testimony is corroborated by the officers' body camera videos, which were received in evidence. Detroit police officer Collin Maciejewski testified that he and his partner, Austin Bochar were in a marked police car patrolling a west-side Detroit neighborhood on the evening of February 21, 2024. At

around 9:30 p.m., they spotted a 2015 Lincoln MKZ parked on the wrong side of the street, partially blocking the sidewalk. The engine was running, and the headlights and taillights were illuminated.

The officers exited their vehicle; Maciejewski went to the driver's side, finding defendant Howard behind the wheel. Bochar went to the passenger side and asked the occupant to roll down the window. The passenger complied. Howard was not as cooperative. He did not open his window fully, and when Maciejewski asked him for his driver's license, Howard handed him a photocopy of his state ID card and some other folded papers through the slightly-opened window. He did not produce a driver's license.

Meanwhile, Bochar, shining his flashlight on the Lincoln's interior, saw the handle of a gun on the driver's side floorboard. He testified that he spotted the gun approximately three minutes into the stop. The gun is not visible on Bochar's body camera video footage; he explained that the camera was mounted on his chest, and his eye-level vantage point allowed him to visualize the driver's side interior floorboard and see the gun.

Bochar alerted his partner by mouthing the word "gun" and saying "floorboard." Maciejewski testified that Bochar notified him to get the driver out of the car because of something he saw. Maciejewski had asked Howard if it was "ok if [he] opened the door real quick." Maciejewski Video, at 21:30:18. Howard asked why he needed to open the door for the officers, and Maciejewski responded that he would need to step out of the car because he "ha[d] an ID" and was blocking the sidewalk." *Id.* at 21:30:22-21:30:27.

Howard continued to dispute whether he needed to step out of the car and picked up his phone to "call 911." *Id.* at 21:30:27-21:30:44. At that point, Bochar opened the passenger door and ordered the passenger out of the vehicle. Bochar Video, at 21:30:44. Maciejewski asked

Bochar if he "got it?" *Id.* at 21:30:44. It was then that Bochar responded with the word "floorboard." *Ibid.* As the passenger got out of the car, Bochar was able to unlock the car doors, and Maciejewski removed Howard from the vehicle. Howard acknowledged that he did not have a concealed pistol license. After securing Howard and the passenger, Bochar returned to the vehicle and recovered a firearm from the floorboard of the driver's side of the vehicle where Howard had been seated. *Id.* at 21:32:12. Howard was arrested for possessing a concealed weapon without a proper permit. Investigators later determined that the weapon, a Magnum Research Desert Eagle 1911G .45 caliber pistol, was loaded with eight hollow-point bullets. Howard also was ticketed for parking on the sidewalk.

The officers had to call for a larger backup vehicle because Howard was too large to fit into the back of the patrol car. He was transported to a hospital when he complained of stomach pains, and later he was taken to jail. The entire encounter from initial contact to Howard's removal from the scene lasted about 15 minutes.

On March 20, 2024, Howard, a convicted felon, was charged in a one-count indictment with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). He moved to dismiss the indictment as unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 71 (2022). The Court denied his motion. ECF No. 32. Shortly thereafter, Howard obtained new counsel, who filed the present motion to suppress evidence.

II.

Howard acknowledges that he was parked illegally on the wrong side of Ward Street, but he insists that the officers' only legal option was to issue a parking citation to the vehicle itself. He argues that their command that he exit the vehicle unlawfully extended the stop beyond the time necessary to investigate the parking violation. He adds that the officers lacked reasonable

suspicion necessary to investigate other crimes. He also questions whether Officer Bochar could have spotted a gun on the floorboard of the car considering the tight dimensions of the vehicle.

Howard bases his argument on the Fourth Amendment, which prohibits "'unreasonable searches and seizures.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV). It is generally understood that a search is "unreasonable" "if it is not conducted pursuant to a warrant issued upon probable cause." *Ibid.* (citing *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528-29 (1967)). Equally well established is the rule that "[a] warrantless search or seizure is *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *King v. United States*, 917 F.3d 409, 422 (6th Cir. 2019) (quotations omitted).

One of those exceptions allows a traffic stop when a police officer has reasonable suspicion of an ongoing crime or a completed felony or when he has probable cause to believe that a civil traffic violation has been committed. *United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007). And "[a]n officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts.'" *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012); citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

The officers' initial approach to the illegally parked, running vehicle and its occupants to investigate why it was parked on a sidewalk in violation of a Detroit city ordinance was entirely lawful. One of the exceptions to the Fourth Amendment's warrant requirement is that police may conduct a traffic stop when there is probable cause to believe that a civil traffic violation, such as a parking violation, has been committed. *King v. City of Rockford, Michigan*, 97 F.4th 379, 391

(6th Cir. 2024); *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) ("[A]n officer can effect a stop based upon a driver's failure to comply with Michigan's parking regulations . . . .").

Howard's argument that the officers improperly extended the stop is based on well-established precedent holding that a lawful traffic stop must "be limited in scope and duration." *United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." *Rodriguez*, 575 U.S. at 354. "[A] measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,' . . . is not an ordinary incident of a traffic stop." *Id.* at 355-56 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). "If an officer exceeds the scope or duration of the traffic stop, he must have 'reasonable suspicion' to continue the stop on unrelated grounds." *Whitley*, 34 F.4th at 529. Although officers may conduct investigations unrelated to the stop, they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355.

The evidence plainly establishes, however, that the encounter did not extend beyond constitutional limits. First, Howard's argument that the police officer's only option under the circumstances was to issue a parking ticket is defective. He says that a parking violation is issued to the owner of the car, not to the occupant, so the officers need only have inputted the car's license plate information, printed a ticket, and placed it on the vehicle's windshield. True, the officers had that option; the City of Detroit's municipal code states that police officers who observe parking violations "shall take [the vehicle's] registration number [and] may take any other information displayed on the vehicle, which may identify its registered owner, and shall conspicuously affix to such vehicle a parking violation notice or citation." City of Detroit Code § 46-1-42. However,

the City also has adopted the Michigan Vehicle Code, *id.* § 46-3-1(a), which plainly states that "[a] police officer who issues a citation for a vehicle that is stopped, standing, or parked in violation of a state statute or a local ordinance prohibiting or restricting the stopping, standing, or parking of a vehicle may issue the citation for the violation to the operator of the vehicle if the operator is present at the time of the violation," Mich. Comp. Laws § 257.675c(4). Issuing a citation in those circumstances would involve tasks incidental to typical traffic stops, such as requesting the driver's identification documents. The citation issued here includes the defendant's name and license information. *See* Hr'g Ex. 5. Requesting these documents did not prolong the stop.

Second, although Howard and his passenger both were seized within the meaning of Fourth Amendment when confronted by the police, *Brendlin v. California*, 551 U.S. 249, 255 (2007), Officer Maciejewski's order for Howard to exit the car was lawful. It is hornbook law that officers may order a driver to exit the vehicle during the course of a lawful traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). This authority largely is derived from the inherent risks to the safety of officers posed by traffic stops. *Ibid.* Howard attempts to distinguish *Mimms*, arguing that it does not apply to parking violations, only to moving violations. He cites no authority for that proposition, however, and the Sixth Circuit generally treats stops to address parking citations similarly to other traffic stops, at least for purposes of whether observing a violation gives grounds for a seizure. *See Copeland*, 321 F.3d at 593; *United States v. McKenzie*, No. 21-3587, 2022 WL 1744500, at *4-5 (6th Cir. May 31, 2022). These cases do not necessarily address the scope of an officer's permissible activities when responding to a parking violation, but they do suggest that both are generally evaluated under a similar "traffic stop" rubric.

Treating both types of stops the same makes sense. A stop to issue a parking citation likely will look and feel much like a stop to address a moving violation, prompting similar safety

concerns. Howard has not explained why the safety rationale justifying the *Mimms* rule in the context of moving traffic violations would not also apply to parking violations. Rather, his observation that the officers can perform their function by putting a parking ticket on the vehicle's windshield highlights the problem. Placing a parking citation on an unoccupied vehicle likely poses minimal risks. But placing a citation on an occupied vehicle, as here, could provoke an unwelcome or hostile response. *Mimms* recognizes officer safety is a "legitimate and weighty" state interest, 434 U.S. at 110, and the Supreme Court accordingly has characterized an officer's authority to order a driver out of the vehicle during a traffic stop as a "*per se* rule," *Maryland v. Wilson*, 519 U.S. 408, 412 (1997).

Third, once Maciejewski asked Howard for his driver's license and vehicle registration, another crime emerged that warranted further inquiry. Howard was not able to produce a driver's license. Michigan law requires a "licensee" to have his "operator's or chauffeur's license . . . in his . . . immediate possession at all times when operating a motor vehicle, and shall display the same upon demand of any police officer." Mich. Comp. Laws § 257.311. Howard, citing *People v. Lardie*, 452 Mich. 231, 551 N.W.2d 656 (1996), and *People v. Wood*, 450 Mich. 399, 538 N.W.2d 351 (1995), argued in his brief and at the hearing that this statue did not apply to him because he was not "operating" the Lincoln at the time of the encounter. Again, Michigan law does not favor his argument.

The applicability of *Lardie* is not immediately apparent. The case considered the constitutionality of the statute forbidding operating a vehicle while under the influence of intoxicating liquor but says little, if anything, about the quantum of proof necessary to prove that a driver was "operating" the vehicle. It was undisputed in that case that the defendant operated the vehicle by driving it off the road and into a tree. *Id.* at 235, 551 N.W.2d at 658. *Wood* is a

closer fit but still does little to aid the defendant. In that case, the Michigan Supreme Court held that for purposes of the operating under the influence statute, "operating" means that "a person using a motor vehicle as a motor vehicle has put the vehicle in motion, or in a position posing a significant risk of causing a collision," overruling a line of cases suggesting that an individual asleep in a motionless car cannot be held to operate a vehicle. 450 Mich. 399, 404-05, 538 N.W.2d at 353.

The defendant contends that this concept of "operating" a stationary vehicle applies only to drunk driving cases and does not extend to the licensing statute. He says that because his vehicle was not in motion and did not pose a significant risk of collision, he was not "operating" it at the time. That argument ignores another section of the Michigan Vehicle Code that defines "operate" generally to include "actual physical control of a vehicle." Mich. Comp. Laws § 257.35a(a). The Michigan Court of Appeals has explained that *Wood* did not limit the reach of section 35a or require proof that the driver caused the vehicle to move as a requisite of "operate." *City of Plymouth v. Longeway*, 296 Mich. App. 1, 9, 818 N.W.2d 419, 423 (2012) (holding that *Wood* "did not purport to nullify or narrow the clear statutory definitions of 'operate'"). Instead, *Wood* merely "clarified how the statutory definitions should be applied in a particular context." *Ibid.*; *see also People v. Yamat*, 475 Mich. 49, 53-54, 714 N.W.2d 335, 337 (2006) (defining "control" for purposes of the Michigan Vehicle Code as "power or authority to guide or manage"). During the motion hearing, Officers Maciejewski and Bochar each testified that Howard's vehicle, although in park, was running and that the car's headlights and taillights were illuminated. When they approached his vehicle, Howard handed Maciejewski a stack of papers that included a state ID card. Maciejewski testified that Howard never provided an operator's license, however. This testimony adequately establishes that the officers had reasonable suspicion that Howard exerted

"actual control" over the vehicle without a proper license in violation section 257.311. Looking further into that violation and ordering Howard out of the car did not prolong the encounter unreasonably in violation of the rule in *Rodriguez*, since the tasks connected to the parking and license violations were ongoing at the time. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed.").

Finally, it was during these permissible inquiries that Officer Bochar observed the firearm on the floorboard of the Lincoln. Howard argues that Bochar could not realistically have spotted a weapon on the driver's side floorboard because he was on the passenger side of the car and no weapon is visible on his body camera footage. However, Bochar offered a cogent explanation for the apparent discrepancy during his hearing testimony, which the Court finds credible. Bochar saw the weapon within three minutes of approaching the passenger side of the Lincoln and almost immediately signaled his concern to his partner. That happened *before* Howard was asked to step out of the car. The vantage point of the body camera's angle neither confirms nor negates Bochar's testimony, but the circumstances as disclosed by the testimony and demonstrated by all the body camera footage of the encounter generally supports the conclusion that Bochar saw the gun during Maciejewski's permissible activities incident to the traffic and license violations.

III.

The police officers' conduct during their investigation of Howard's illegally parked vehicle did not constitute an unreasonable search or seizure in violation of the Fourth Amendment. There is no basis in law to suppress the firearm discovered during the encounter.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence (ECF No. 40) is **DENIED**.

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Dated:   December 23, 2024

- 10 -